May it please the court, Brent English for the appellants, David W. Carter and Robert Thompson. I would like to reserve three minutes of my time for rebuttal. Let me clear up the pronunciation of whatever you said. It's Hamaoui. As I understand it, it took me a while to figure it out as well, but that's my understanding of the pronunciation of one of the appellees. Your Honors, this is a most interesting case involving my clients. Mr. Carter works for a company that's owned by his wife, and on a particular day in August of 2013, pursuant to his job, he was en route from the city of Lorain, which is approximately 35 miles due west of Cleveland, into the city of Cleveland to deliver a variety of recycled metals, which is part of his wife's business. As he's proceeding down the road, he is very aware that the city of Rocky River, Ohio, one of 62 municipalities in Cuyahoga County, has a very vigorous speed enforcement policy, and so he deliberately slows down to seven miles under the speed limit, puts his truck on cruise control, and is proceeding in every manner lawfully through the city of Rocky River. The deputy's overweight, as it turns out. Well, actually, that's an interesting question, and let me address that in a moment, Judge Gilman, if I may. As he comes around a slight corner, he discovers, or he doesn't even initially see, a Rocky on-ramp to an off-ramp, who he does not know is specifically looking for his truck because he has been directed to do so by his supervisor. This gentleman is named Krates. He is not a defendant in this case. As Mr. Carter comes past him, the officer pulls out. He has a dash cam video that's part of the record, and the dash cam video shows precisely that Mr. Carter is going between 52 and 53 miles an hour, just as he's indicated. His speed is not variable. He is not weaving within a lane. He is not doing anything inappropriate whatsoever, including being overweight, Your Honor, and let me deal with that in a moment. The officer follows Mr. Carter for approximately two miles down the road, ultimately turns on his overhead lights and pulls Mr. Carter over and comes up to the vehicle and has a discussion with Mr. Carter and Mr. Thompson. There is no odor of alcohol. There is no odor of marijuana. There is no indication whatsoever that this truck is unlawful or that the driver or the passenger in the vehicle have any wants, warrants, capuses, or have done anything illegal. Okay, so kind of a cut to the chase here. They suspect he's carrying drugs. They pull him over. He doesn't have any drugs. They trash his load, and he says, you had no reasonable suspicion to stop me. You violated my constitutional rights. That's exactly what he said. And so, in a sense, the issue is, how legit is this overweight requirement? They have some other things. They've fallen by the wayside, but assuming that there's reasonable suspicion of overweight, they're probably okay. If there isn't, they're probably not. So can you address the overweight issue? Sure, I'd be happy to. Well, first of all, the record of this case was decided on a summary judgment motion, so the record of it is as follows. Mr. Carter and Mr. Thompson both indicated that the tire inflation on this truck was completely appropriate, that tires are radial tires. And if you know anything about tires, and this is just set forth in the record, most truck tires, in fact, virtually every truck tire today is a radial tire. And so radial tires have a slightly different configuration than the old, what are called bias ply tires. Bias ply tires are very rigid. A radial tire has a little bit of movement. But virtually every car in the United States at this point is operating off of radial tires. The contention was the officer claimed that he could see some kind of a, quote, bulge, this was the term, on the rear tires. However, he never identified the extent of the bulge. He never obviously photographed it. And you can see the tires in the video that do not show any unusual bulge whatsoever on the tires. The question legally is whether or not an alleged bulge tire without any other facts is sufficient in order to find a reasonable, articulable suspicion to pull the vehicle over. And although this court has never addressed the issue, a number of Ohio courts have in this question because this is a frequent issue when it comes to whether or not a truck should be pulled over for some kind of truck enforcement in the state of Ohio. And the case law in Ohio has been very abundantly clear that bulging tires without more is insufficient as a matter of law to create reasonable, articulable suspicion. However, the district court held exactly the opposite. We think that that is legal error because there are many reasons that truck tires could potentially be, quote, bulging or not bulging, one of which is inflation. But in this case, specifically, Mr. Carter testified that he checked the inflation on these tires before he left, just 15 minutes before he was pulled over. So there's no question, at least from the record evidence, that there's a genuine issue of fact and dispute as to whether there was any bulge or not. What the district court appeared to conclude was because there had been a subsequent weighing of the truck and a purported alleged overweight of the truck, that that was sufficient evidence to support the contention that the police officer had reasonable, articulable suspicion to pull over the truck in the first place. Of course, that is not consistent with the law. Whatever you subsequently find in a search does not necessarily support. In fact, it's not even relevant to whether there's reasonable, articulable suspicion to make the stop in the first place. But that appears to be where the district court lost its way. And further, there's a question about what the lawful weight of this vehicle is, coming to Judge Gilman's point. In this case, the contention was that the vehicle was allegedly 5,000 or 6,000 pounds overweight. However, there is no evidence in the record to support that at all. And in fact, as we pointed out in our brief, the method to determine the maximum allowable weight of a truck under an Ohio statute, 5577.04, is you have to know the total number of axles, you have to determine the distance between the axles, and then you apply a formula to determine whether or not a truck is at its maximum allowable weight. There is no evidence in the record that this was done. And in fact, the traffic citation that was given to Mr. Carter was subsequently dismissed by the prosecuting attorney after a motion to suppress was filed in that case, alleging the exact thing I just said. There's no basis to conclude. Am I right that it was in fact weighed at 26,100 pounds? That's what the officer claims, that it was weighed. But there's another little problem with that, and I don't mean to get into the weeds. Okay, well, let's pass that one unless you're going to rely on it heavily. The question then is, and obviously I'll ask your adversaries, what's the amount that they say the limit is, and what's that based on? Is it only that 557704? They claim that the amount was 19,500 pounds, and they based that upon a contention that this is what a database allegedly showed them, even though the database is not part of the record. And the database, at least that number as I read it, was a database of vehicle ratings by manufacturers, not by statutes. Exactly right. Is that correct? That's exactly right. Okay. So even if General Motors thought it was too heavy, that doesn't mean that the statute says it was in whatever state you're in. You could have a statute that says don't load it above the manufacturer's GVWR, but that's not the Ohio statute as far as I know. That is exactly correct. That is exactly correct. Do you have any opinion, or is there anything in the record of what the maximum legal weight was actually for Carter's truck? Well, Judge, it would depend on the distance between the axles and the application of the formula, and I have not done that, and there's nothing in the record that would say that. Well, when it was weighed after it was towed in and weighed, they determined it was, what, 19,000-something, and this was 6,000 pounds over? They determined it was 26,500 pounds. I believe that's correct. That's just the fact of what it weighed. The question is what's the standard, at least when I ran the formula and Judge Gilman's an MIT grad, so he can do this better than I, but I couldn't come up with a number that was less than 30,000 or more if you applied the formula. Your Honor, when I do the same, I agree, but that's just one of the ancillary issues. Let me address one other issue that I can't, I see I only have two minutes left, and that relates to the reliance, in part, that the appellees really rely on this, that somehow they had a confidential informant that told them there were allegedly drugs on this truck. Well, the law is very clear that in order to rely upon a confidential informant to make a traffic stop such as this, there has to be some evidence that the informant is reliable, that the informant has knowledge, and that there's some basis to rely. In this case, ironically, I attempted to, ultimately, after taking a whole series of I finally identified a police officer in the city of Lorain who supposedly had heard from some confidential informant that nobody had a name for as to, that he had this information from this confidential informant, told the DEA about it, DEA told Rocky River, and the state trooper was involved, etc. So I wanted, the record is completely without any evidence at all that this confidential informant even existed, but secondly, that any information this confidential informant had was reliable, that he had any basis whatsoever to contend this, and although I submit this is logical, I'm sure I'll hear a chorus of objections, there were no drugs found on this vehicle whatsoever. So by definition, whatever claim was made here was obviously specious. I don't know that a claim was ever made, but somehow Mr. Carter's truck came to the attention of the Rocky River Police Department. Do you agree, I guess their brief seems to say that at least this originated with a Detective Thompson of Lorain, and you're saying that other than the fact that it did originate with him, we don't know anything further? That's correct, and ironically, I tried to depose him, and this was opposed by the other parties, and ultimately I was unable to take his deposition, this was, I only learned of his existence and his involvement after I took the DEA agent's deposition, which was a long process getting to be able to do that. Conversely, we don't have anything affirmative even by allegation that Detective Thompson said, you know, I have dealt with CI-48 for ten years and he's always given reliable information the way you usually see. Precisely right. There's nothing in the record to support that at all. Okay. I'll reserve the remainder of my time. Thank you. Time for rebuttal. May it please the Court, my name is Frank Skeldone and I represent Officer Hamway as well as the City of Rocky River. The District Court properly held that there was reasonable suspicion under the totality of the circumstances, and, you know, I'd like to correct counsel's characterization of the District Court's opinion that the District Court went awry when it relied on an after the fact determination of what the truck weighed. In actuality, the Court went through, found three factors very significant. One, and the video confirms this, is that the load was visually, you know, looked visually overloaded with these four by four packaged aluminum cans. They almost looked to be hanging over in certain respects of the flatbed of the truck. The cans don't weigh very much, aluminum cans. There's more on the truck, but, yeah, I would say the same thing. I guess a lot of them, when you pack them together, the weight gets substantially more. The other factor that the District Court relied on is that you do have bulging tires. For whatever reason, there's bulging tires on the back of this truck that would lead a reasonable, there'd be a reasonable inference that the back of the truck is overweight. When you're looking at the, visually, when you're looking at the weight of what's on the truck. Was your guy a overweight inspector? Did he say, you know, we've had training and we know if the tires are bulging, then it's more than 27,000 pounds? He didn't go into that, no. He wasn't. He wasn't. Yeah, he wasn't. He was a standard, you know, he had the standard training that he has in terms of determining reasonable cause, reasonable suspicion and probable cause, et cetera. But he was not an expert in that. But you don't have to be an expert to be able to see in this circumstance, when you're looking at what the truck looked like, the fact that the tires in the back are bulging. And the other factor that the District Court relied on was the slow speed. Well, the counsel, though, says that all radial tires are bulging to some extent. And are you saying that this was some unusual bulging than the regular bulge you would get from a, you know, a radial tire on a big vehicle? That would be what the, I mean, the officer just testified that the wheels in the back of the truck were bulging. And that was confirmed by not only his testimony, but the testimony of Officer, I believe it is Hine, who did the weighing of the truck and ultimately made the determination to issue the citation that it was overweight. Is there a dispute, a genuine dispute of material fact about that? Because Carter says he checked the inflation before they set off on the journey and the tires were okay. I don't know if it's a material dispute of fact on that. If the ball, if the tires look like, even if there is, it's properly, if there's the proper inflation of the tire, if it appears that the back of the truck is overloaded with these large cubes of metal and the tires are bulging, I think you can make an inference, a reasonable inference, that the truck could be overweight. But if that's the basis for the stop, why wouldn't that be a material issue of dispute? I mean, even if you're talking about the officer's perception and observation, if that's the basis for the stop, that's the probable cause. Well, I think no matter how the, no matter how the, if the, you know, the inflation of the tire is, if you do have overloaded and what they did determine, it was overloaded, there would be extra bulging no matter if it was perfectly, perfectly inflated. So that's what the officer's perception is. It looks overloaded, that the tires are bulging. And third, and this is another factor that the district court relied on, was the slow speed. And it is odd. I travel this, I travel this route every day and I-90 moves pretty quickly, certainly over the 60 mile an hour speed limit. To have a truck of that size with that load on it going that much below the flow of traffic I think is another factor. No, it's not like he's going 30 miles an hour. No, no, no, no. And I don't mean to- I agree. I mean, do you mean you can pull over any truck that's going within 10 miles of the speed limit? No, no. Of course not. I don't. I'm just giving you the three factors that the district court relied on. And when you bring all those together- Am I right on this slow speed that the video, the evidence, shows he's 53 or so. The officer claims that he was going slower earlier, but that would seem to be a disputed issue, wouldn't it? Yeah, I think what he said was he was going slower and weaving. And then when he flicked the lights on, like cars typically- The video doesn't show weaving, so again- No, because it goes on when the- He says he wasn't. The officer says he was. That's a disputed issue. That's correct. And that's- Let's go over to the weight. On the one hand, I guess they have a little quibble, but let's say that it really weighed 26,100. The question is, what is your argument as to what the right statute limit is, and did Hamway know it, and how did he judge that it was more than that limit? So go through those- I have the determination of how it was ultimately done was in Officer Hines' deposition testimony on how he figured out that it ultimately would be overweight, and it had something to do coming from the registration tags of it. As far as Hamway, I think it's under the circumstances that he had, he can make the determination to pull over the vehicle if he sees the bulging tires, if he sees a visually heavily overloaded truck, and- He has no idea what the law is? Well, I think that's- What I'm saying is that the- I don't know if the testimony goes into detail what the exact amount that he thought the truck should be at is. What I do know is- But the records pretty well showed he didn't have any idea. Officer Hines, though, did do those calculations and did have that, but- Do we agree that even Officer Hines is going off of this manufacturer's database, not off of some statutory base? I apologize, I can't say. What I have is at page 29 of his deposition, it came from the registration tags, which apparently through the LEED system, there can be a determination of- At least as I followed it. And I just don't- As I understand that, it's saying that this is a certain kind of truck, which actually depends on whether it has front or four-wheel drive, but the manufacturer says it should weigh so much. That's the way I read it. We can go back and read it again, but I just wanted to give you the chance if you were telling me any different. Okay. Sorry. All of these officers all down the line were really operating and acting on and looking for a basis to stop this truck based on the information from the CI, correct? Well, I think, yeah. Ultimately, whether the reason for them pulling over the truck, I don't believe that. It's not subjective. They knew that there was a- They, of course, knew that there was a truck that fit this description quite closely. They knew that there was a truck that fit that description. Correct. He just kind of passed along, you know, try to find a traffic reason to stop the truck. And they found the overweight bolting tires and weaving. I think that, you know, it's absolutely correct that he received a text message from a reliable source, because he's really relying, and I guess this goes into qualified immunity, that he's receiving that from his supervisor. And we'll have to talk about reliable a little bit later on, but I know your light is on right now. Okay. We'd ask the court to affirm the trial court's decision. Thank you. Okay. Thank you. Good morning, Your Honors. May it please the court. I'm Morgan Lynn. I'm representing Trooper James Baker today. And I would ask this court to affirm the district court's award of summary judgment for Trooper Baker. So, for the things that have been discussed, don't have much to do with Trooper Baker. He did not make the stop of the vehicle. He did not participate in any part of weighing the vehicle. But I will, at the tail end of Mr. English's time up here, he did get into a confidential informant tip. So, I can speak to that as well, because Trooper Baker was passed on and given that same information, even though he did not stop Petitioner's vehicle. Under Alabama v. White, that case dealt with anonymous tips. And to determine the veracity of the tip, specific cooperation of the details of that tip are needed. And that's exactly what happened in this case. Regardless of the traffic violations that were cited for the reason Officer Hamway made the stop, there was also a tip that existed, and Officer Hamway corroborated it. We had a... The tip was the truck loaded with these cans, traveling in a particular direction, and that there were drugs there. So, beyond those things, only three of those things were corroborated, the truck, the cans, the direction. What is it about that that would serve to make that a reliable tip? Well, I think a little more... I mean, it was just very specific. They were able to corroborate. There was... The color was passed on that it was a black, a specific type of black flatbed truck. What it was hauling, scrap metal, specifically crushed aluminum cans. And Hamway saw the three cubes, if you watched the video, on the very back of the truck, driving on I-90 location. And then comes in the predictive information, driving eastbound towards Cleveland. So, he was also able to confirm that as well, as he sat watching the strip of I-90. And then came the criminal activity, that drugs may be contained within those aluminum bales. So, all of those things were able to be corroborated by Officer Hamway's visual observations, and that would justify a basis for a stop for reasonable suspicion. You mentioned the drugs at the tail end, but there was no corroboration of drugs at any point in time, right? And it's very questionable about the dog Paco's alert to a controlled substance, correct? Yes. Paco did, once the vehicle was stopped. You're right, Your Honor. Actually, the drugs wasn't like anything was visual from the street, so that would not be a basis to stop the vehicle. But very close in time after, Trooper Baker got out his dog Paco and walked around the vehicle, and Paco had indicated to the odor of narcotics, that him indicating to narcotic odor would corroborate the tip that there were possibly drugs somewhere contained in the vehicle. As far as Baker's concerned, I mean, is it kind of, why are you spending so much time justifying the stop when he didn't make the stop? The way Baker avoids liability is he did his dog what his dog's supposed to do, and unless there's a, and you know, they make an argument about the toy and so on. But unless you believe that, Baker has no liability, right? Right. No, no. I'm just helping out co-defendants. My portion had not come up yet for topic, so if you do have any questions regarding dog sniff. To me, that's the question of liability, is whether Baker evilly primed the dog, and we'd look at the video and can make a judgment on that. I suppose the district court made his judgment in your favor. Isn't that pretty much the guts of it? That absolutely is. As far as your guy? There's plenty. Scott versus Harris. There's a video here. So, in a recent case, out of the district court in Ohio said, you know, when you have a video that's controlling, then the court should look at this case in the eyes of, depicted by the videotape. But what if you have a video that is ambiguous? I mean, there's an argument that your client illegally placed a toy to get the dog to alert the first time, and you can see something either against the truck or falling away from the truck. He says they put the toy up there and the dog alerted to the toy, not the odor of an intoxicant. The dog then was taken around the truck a second time, and the dog did not alert. A second dog came, and the second dog never alerted. So, doesn't that raise some kind of a question? Well, you know, no dog is perfect. Dogs certainly are not infallible. However, Florida versus Harris, the United States Supreme Court has said that if there is a bona fide organization that has certified and trained, you know, drug-suffering canine, that that dog's positive alert can be presumed to create probable cause. But that also assumes that there will not be any kind of, I guess, unlawful interference or priming by the handler. Sure, sure. And there wasn't any here. The argument is that there was, correct? Absolutely. And the district court watched the video and said that petitioner's allegations were directly, blatantly contradicted by the video. If there is any question, I'm happy to explain that the dog walks around counterclockwise, and different seams of the vehicle are presented. Think of it as a zigzag motion, if you will. So, during that time, the dog is presented these different areas, and he smells. The dog on the video, you can see him jump up. On Baker's video, scratch. You can hear the scratching for five seconds. And then, where they keep the toy, sometimes it's a ball, sometimes it's a PVC pipe. It's got to be something that's very durable with the dog's teeth. And he'll pull it out, because the dog does think that he is smelling for that narcotic odor. And you can hear, as Trooper Baker throws in a downward motion, it is coming down, and flipping around, hits the truck, and bounces off. That's what Paco goes to obtain. As one trainer put it, because, apparently, Paco still believes in Santa Claus. He thinks that when he indicates, all of a sudden, here comes my treat toy. So, that is what I believe that the video shows. The district court certainly agreed with that interpretation. There was no attempt for Trooper Baker to sit his stick up onto the truck and cause it to fall. With regard to the question of videos in Scott v. Harris, which is a Supreme Court case, as I understand the law, and tell me if you agree or not, is that we still give the district court findings of fact deference, unless we find the video compelling in the opposite direction,  If we think it is ambiguous, we would not find clear error in the district court's findings. If we watch the video, and we are so convinced that he got it wrong, then we can say that. Right. Right. Right. And if there are any other questions? No, judges. Thank you. Thank you. Time for rebuttal. Let me address the whole dog issue. There were two dogs in this case, Paco and Storm. The allegation is that Paco allegedly alerted to the presence of narcotics, or the alleged presence of narcotics. Storm did the exact same thing, trained in the exact same way, and never alerted whatsoever. That's an interesting issue. In that Florida case, the fact that even the same dog sometimes correctly alerted and sometimes didn't correctly alert didn't make him improper, so the fact that a different dog didn't bark wouldn't seem to, you know, sometimes Aaron Rogers throws touchdowns and sometimes he throws interceptions, he's still a good quarterback. Well, that's correct. And so my point in this case is not necessarily that you cannot ultimately, if you find or if the court finds that the dog in fact alerted, that would give a basis for probable cause. I concede the issue. However, in this case there is, I think, sufficient rebuttal evidence in this case that a reasonable jury acting reasonably, considering the video and the testimony of Mr. Carter, could find that in fact the dog never alerted at all. David Carter said that he was sitting in a police car immediately behind this and observed the officer cause this toy to be hit onto the back of the truck and that's when the alert occurred. And I think reasonably looking at the video you can easily conclude that and to suggest somehow, with all due respect, that this is a blatant misrepresentation of what the video shows, I respectfully believe is a dead wrong. You heard the way I put the law or my view of the law to your adversary. Isn't that basically right, that the district court would still get first deference and we would need to find that blatantly contradicted by the video the way they did in Scott v. Harris? In part. There is an additional, remember this is a summary judgment proceeding, so if there's a genuine issue of material fact about whether the dog alerted or didn't alert, I should, the court should reverse. And this is an ultimate question for the jury. The strongest point is probably not the dog business, but whether there was reasonable suspicion to stop your client. Well, that's why I started there, because I recognize there's a dispute in the record about this, but ultimately I wanted to address that point because I had not. The idea that somehow Officer Hamway had any clue what he was doing when it came to commercial truck enforcement is apocryphal at best. Officer Hamway conceded in his deposition, and I took this deposition, it's in the record, that he had no idea about commercial truck enforcement, had never been trained to do this, had no idea what the meaning was of the bulging tires, and to answer your point, Judge Donald, this was as close to a pretext as could ever be. Now, I understand a pretext is not going to get me there, but they knew, they thought that they had a big drug bust coming because of some alleged confidential informant who hardly ever told them this, and so they found a way to pull this vehicle over. That is an unquestioned violation of my client's constitutional rights, and as a result, the district court's judgment should be reversed. Thank you. Thank you, counsel. The case will be submitted.